Good morning, Your Honors. Good morning. I'm Robert Beckham on behalf of Palm Desert National Bank. This is an appeal concerning a financial institution bond and the in-transit coverage provision of that bond. My client, the bank, wanted to ensure the risks that it could not, through reasonably prudent controls, you know, maintain. So it bought this financial institution's bond and it paid a premium of some $155,000 for it, two-thirds of which covered the in-transit coverage provision of the bond. And it's our position that this bond provided for seamless coverage from the time our vault cash left our custody and control, went into the custody and control of the armored carrier, and under the Clause 3 of the bond, specifically 3A, that coverage continued while the custody and control of the armored carrier of the cash from the time it was picked up by the armored carrier until it was delivered to its intended destination. Can you help me? Was the purpose of the bond, that is, to ensure for risks that occur, that exist when the money is outside the control, is that control purpose right there in the bond? That's right. That's exactly, Your Honor. But, you know, is it expressly set forth in the bond itself? That's correct, Your Honor. Where? In Clause 3. But what language are you relying upon that is that exactly? Is the word control, is that? No. It says coverage begins under that in-transit section when the cash is picked up by the armored carrier and continues until it is delivered. Well, I understand that clause, but I was asking a different question, and that is you have characterized the purpose, overall purpose of this bond to ensure risks when the money is outside the control of the bank. And I was just asking whether outside of this transit clause, the key clause here, there is any reference to that purpose, or whether there's any industry description or? I'm not aware of that, Your Honor. I will tell you that the financial bond covers all sorts of risks, including the in-transit. It covers forgery, it covers counterfeiting, it covers employee dishonesty, all kinds of risks that the bank can't ordinarily, by its own controls, protect. And in this instance, the cash involved was outside of its control during the time that it was in the control of the armored carrier. And what I would suggest to Your Honor is that the district judge cited a case referred to in all of our briefs called Aetna. And the district judge was concerned because in that case, even though the court found there was coverage, the rule might have been different. The holding might have been different if there had been additional work that needed to be done on the transit. In our case, there was work that had to be done on that transit, but the work was done while it was in the custody of the armored carrier. But it wasn't in the armored vehicle, which, that's the problem I have because the bond clause says if it's in transit anywhere in an armored vehicle, including loading and unloading thereof.  And then the clause goes on to state, Your Honor, that that coverage begins when the cash is picked up by the armored carrier and continues while it's in the custody of the armored carrier until it reaches its intended destination. That's kind of the last, the overall last clause. That's right. But it's not in that loss of property clause. But it is in the insuring in transit clause, which covers cash money that was lost while in an armored vehicle, during the loading and unloading, and during the period of time that that cash was in the custody of the armored carrier. And it's clear from this, in this case, that the intended destination of the cash was not the armored carrier's location, but rather the ACM, the automated cash machine, in question. It just seemed to me, just common sense wise, that that was a risky proposition to have the armored carrier employees, you know, doing these cassette transfers and counting the money and replacing the money. That does not seem to be a typical transit function for them to take the money and replace the cartridges and count the money and reconcile the balances. Just as a common sense looking at it, it doesn't appear to me that would be something that would be part of the transit part of the armor. Your Honor, I respectfully disagree, because in this situation, what the armored carrier was doing was picking up a bundle of cash that had to be separated and placed into cassettes. And under the armored carrier's agreement, which the insurance company has it had as part of its application and underwriting, and that is in our excerpts of the record at page 149, that agreement, it says that the armored carrier is to transport, replenish currency, balance, and settle services. The only way this cash can get into an ACM is if it is taken from the bundle, loaded into a cassette, and then actually deposited in the ACM. In other words, the journey was to start at the bank? Right. My client had a correspondent bank in Philadelphia called First Union. That's where Tristate, operating on the East Coast, picked this cash up, in a large bundle. In a bundle. And then the transportation was to end, did the carrier actually put the cassettes in the ACM? Yes. The armored carrier. So the armored carrier had to transport from the bank the cash, and it was part of the contract of transportation that they put the cash into the little carriers. That's correct. And then deposit them in the ATM. That's correct. Deliver them to the ATM. And the instructions given to the armored carrier was to take the cash from the bank and deposit it in specific intended ACM locations, various ones. So that if the carrier had simply stopped, picked up some of its employees, and had them count the money and put them in the cassettes while they were still on the journey, they were safe. If their employees had done the stealing while they were in the truck, counting the money, it would have been the same thing. That's right. Was there a specific bond for theft or dishonest employees? Yes. That is all part of this banker's blanket bond. Was there some recovery under that portion of the bond? No. What we did was the carrier filed a bankruptcy, and the bankruptcy trustee recovered some money for various different financial institutions that this carrier was doing the same thing for. We recovered about a third of our initial $1.5 million loss. We recovered something over $500,000. We presently have a $977,000 loss. That's from the carrier itself? We recovered it from the bankrupt entity through its trustee. Had that carrier not gone bankrupt, you would have been made whole, correct? I don't know if we would have, because what happened is there was $50 million stolen from a group of financial institutions. The bankruptcy trustee recovered $19 million of that and distributed it pro rata to the claimants. We could have chased the individuals of the carrier if we could have found them, the armored carrier services. The bankruptcy trustee, incidentally, did file a lawsuit against the armored carrier's own insurance policy, Great American. That lawsuit in the bankruptcy proceeding in New Jersey, that lawsuit was unsuccessful because Great American successfully argued that they had been defrauded on their application for insurance and that there was no insurance for Tri-States Armor. So this is a classic case where the bank, my client, did whatever it could to protect its cash when it was outside of its custody and control. Part of the reason this case went on as long as it did, Your Honor, is because we waited until the bankruptcy court had collected what it could collect and distributed to the claimants what it could distribute to mitigate whatever damages that we had suffered. Where is the bond in the record? Oh. It's specifically in the excerpts of the record and if I can, Your Honor, I'll get it out of my excerpt. Page 163. Thank you. Page 163 of the excerpts of the record, I believe. 163, okay. That's what I was looking at. I just wanted to see the proximity of those clauses. Okay. There are two other points that I would like to make, Your Honor, and really this is in reply to the Federal Insurance Company's claim that this was not a direct loss under the bond. We believe that it was a direct loss because the money was clearly Palm Desert's money that was lost. The Federal would like us to argue that somehow we have to identify our specific $20 bills as opposed to anybody else's $20 bills and that ours need to look different or we need to have serial numbers. The district judge wasn't concerned with that at all. He properly concluded that this was a direct loss of money under the bond. And finally, the point I would like to make is to the extent there's an ambiguity in this bond, this is a Federal Insurance Company bond and any ambiguity should be resolved in favor of the insured and in favor of insurance. In fact, my client did everything it could to ensure that its cash was covered from the moment it left First Union in Philadelphia until it reached its intended destination. It was totally out of our custody and control. And under those circumstances, I believe that this Court should reverse the district court's decision and find that there was coverage under the bond. We will then go back to the district judge to determine whether any exclusions in the policy apply. Also, I have attacked the judge's finding that there was no bad faith on the part of the insurance company. That was an analysis the district judge did not make because he found that there was no coverage. So he never really reached the issue of whether the insurance company acted in bad faith. And I would suggest that that needs to be remanded as well. Thank you. I'll reserve. Thank you. Good morning, Your Honors. My name is Gilbert Jensen. I represent Federal Insurance Company. And this case is probably somewhat unusual in that there are no factual issues. The facts were all stipulated in the court below. And all that is left for the novel review is what the contract says between Federal Insurance Company and Palm Desert. The language of the contract is clear. We cover certain loss of property. Property is defined in the policy to include a number of different things. One of those things is money, currency. Currency, money, is a very dangerous thing to have around. It's dangerous to have individuals at an armored motor vehicle company or ACM servicing company put $20 bills on the floor, in tubs, on the counters of a strip mall office and have it available for such things as the employees of Tri-State used it for. But opposing counsel's point is that's the very reason they got the bond. Because they knew that it was, that money was out of their control and that it's easily lost or stolen or purloined or whatever term you want to use. And so that's why the bond was obtained. Judge Rawlinson, I submit that the bond that was obtained was the bond required by the contract between Palm Desert and its ACM servicing company, which is Tri-States Armored. And that was a $50 million bond. Because that is the extent of potential exposures for Tri-States, not the exposure for Palm Desert Bank. And our bond covered specific things. And for when money is in transit, the coverage is in Insuring Clause 3A. In transit, in an armored motor vehicle, including loading and loading thereof. Later in the same Insuring Clause, after a couple of other incidents of transit are discussed, there is the language that coverage under this Insuring Clause begins immediately. And this is the language that Mr. Beckham, Palm Desert, was referring to. Our policy is much different in its in-transit coverage than Standard Bond No. 24, which Mr. Beckham referred to throughout his briefs in a very important way. Though Palm Desert refers to it as, there's no distinctions between the two types of policy. In fact, I think it's too immaterial to split hairs with the language used in the opening brief. The Standard Bond No. 24 has the term in custody in the opening paragraph. So that it covers loss of property in transit anywhere, in the custody of. And I'm referring to an example of where this is cited in the record, Appellant's Appendix Attachment No. 1. And it's not numbered, but the page number of that attachment is 597. Our bond does not have that language. We do not have the custody language in the introductory paragraph to the coverage for in-transit. There's a reason for that. We use in custody in two of the three subsections. Subsection 2, in the custody of a natural person. Give me B. I'm sorry? E? Oh, I'm sorry. 3B. In the custody of a natural person acting as a messenger of the assured. And 3C. In the custody of a transportation company. And being transported in a conveyance other than an armored motor vehicle. And then there's a proviso that reduces the definition of property to just three different items. Low risk items. Money is a risky item. For the protection, what we are willing to grant for coverage to a community bank on that type of protection is spelled out in 3A. In an armored motor vehicle, including loading and unloading. Well, okay. So, go ahead. So, in your view, was the premium that was charged consistent with your interpretation of what was being covered under the bond? Yes, it was, Judge Rawlinson. This particular institution, which is a small community bank in Palm Desert, was operating, I believe, somewhere in excess of 1,000 ACMs around the country. And so it was a risky proposition to put money in the hands of any armored car for transporting from place A to place B. It was not a risk we were willing to take to take the money out of the armored motor vehicle and have it in an office space with up to, I think we gave in the record, an example of a one-week to eight-day period of time that the cash was just sitting around commingled with other institutions' cash. That's nothing that we could have control over and nothing that was brought to our attention as part of the underwriting process for this particular bond. Opposing counsel observed that as part of the underwriting process, your client was informed that there would be this change in reconciliation of the cartridges. Is that true? That is correct. That is in the materials that they submitted to federal insurance companies prior to the underwriting. And that would have to be done by employees? That would have to be done by employees, but it could have been done, number one, in the correspondent bank in the vault there, and then there would be no risk. Or it could have been done in the armored motor vehicle. If it was done in the armored motor vehicle... That doesn't make much sense to me, to say that they should stop the vehicle, bring on all these employees to... And they did it in the confines of this little... of the armored truck with all the employees that were necessary in order to do a... to get the money into the cassettes. Say, well, if they'd done that, that would be covered. But since they put it into their... stopped in their premises in order to have the employees do it there, where it was locked, that... and they thought they could protect it and it was better, more space, that that's not covered. Because it's all incidental to the purpose of the... of the transportation. Your Honor, the... the cassettes could have been picked up in a fully loaded position at the correspondent bank and taken directly to the ACMs to which they were intended to be installed. It didn't require taking them directly to the ACMs. You're speaking bundles of cash, and there's nothing in the materials that were submitted to federal insurance companies suggesting that bundles of cash would be picked up, taken to a third-party location, and then commingled with other bundles of cash, and then put into individual cassettes. Well, is the Aetna case the case where the trucks are parked for... for periods of time, waiting for the employees to come and pick them up, so they're just sitting ducks for the... for the... for anybody who wanted to steal the cargo? Correct. In that case came out that there was coverage? It was still in transit? There was coverage, and what happened in Aetna, it was the containers were brought to a parking lot. They were... the containers were left and the tractors that had pulled the containers to that location went to other employees' homes, and the new employees who were to take the trucks from that point to the next location came to reload the containers, and the robbery had taken place during that time frame while they were sitting there waiting to be picked up again. Counsel, is your argument that, I mean, part of the underwriting consideration was that the armored motor vehicle gave you some sense of security that the money would be inside the armored vehicle and have a sense of security there? Correct, Your Honor. And in the... from a sense of security, it would be if money is being transported in an armored motor vehicle, it can go with, presumably, the guards into the armored motor vehicle, taken to a destination and unloaded from the armored motor vehicle with the same guards and the... so there is a modicum of protection for that money during that time frame. Once it's out of an armored motor vehicle without guard support, there is no protection. And that goes into the underwriting process. And so what case would you rely on for your interpretation of that? Your Honor, this involves policy language that has not been interpreted, which is our language in an armored motor vehicle. Nor has there been any other case law interpreting a surety bond or a banker's bond with a similar sort of transaction involved. The cases that have been reported that are in the briefs are all cases that involve messengers, which we would have covered. I mean, that's in Clause 3B, or they involve other sorts of properties that we would cover if it was in the custody of a transportation company. As far as the case, the Aetna case probably goes for both of us, but it doesn't really give an explanation of... or an actual support. It doesn't really stand for the proposition that we provide coverage or that we don't provide coverage. It just points out that there was no processing of the case, which, from our standpoint, there is once the currency is removed from the armored motor vehicle, unloaded into the facilities of Tri-States Armored, then there is something that's going on. The funds are being commingled with other funds at the same location. They're being made available to Tri-States to pay its own payroll taxes, to buy lunch, or whatever they use the funds for. But the processing is taking place outside of the armored motor vehicle. And so our coverage was not intended to, and does not state that it does cover that. I'd also like to point out, with respect to whether there's unloading and loading, whether there's any potential for coverage while the currency is outside of the motor vehicle, yes, for unloading and loading. But as pointed out by Palm Desert in their opening brief at page 6, Tri-States employees took the bundled money from First Union, loaded the money into Tri-States Armored Vehicle. There you've got the beginning of our coverage under 3A. Transported the money to Tri-States office. Unloaded the money from the armored motor vehicle. That should be the end once the unloading takes place of our coverage under 3A. And placed it in Tri-States cash room. There Tri-States employees unbundled the bulk cash and sorted it into various cassettes intended for the designated ACMs which needed to be serviced. After the cash was sorted and put in the ACM cassettes, Tri-State loaded, again, trigger for our coverage under 3A, the cassettes back into the armored vehicle and transported the cassettes to the designated ACM location. In your view, did the district court decide this case on the language that said in the vehicle? No. No. And that? There are two separate issues that we have here. One is, do we have coverage under 3A because it was in an armored motor vehicle or unloaded or loaded from an armored motor vehicle? And secondly, in the opening clause for ensuring Clause 3, it's required that the property be in transit. That's what the district court decided. Yes. The district court decided that the property, in our case money, was not in transit when it was stolen. Rather, it was sitting in the offices of Tri-States Army. So your position is that even if we disagree with the district court on whether or not it was in transit, that it still has to be in the vehicle? Correct. My position, Your Honor, is that for either of those reasons, and both of these reasons were cited to Palm Desert as reasons why Federal Insurance Company was not paying the claim, is number one, the funds were not in transit, which was how Judge Schiavelli decided the case, and number two, they were not stolen while in an armored motor vehicle. So that, just hypothetically, the motor vehicle, armored truck has an accident, it blows two or three tires, and it's too heavy to get it jacked up with all the cargo in it, so they take the cargo out while they fix it and somebody steals some, steals the money. That would not be in the vehicle, so that's not covered. Your Honor, that might be loading or unloading. If it is taken, if the hypothetical is that the funds were being taken out of the armored motor vehicle and placed somewhere for transport, that could well be unloading. No, they just take them out because it's too heavy and they're going to put them back in later. And somebody comes along. So they're sitting on the sidewalk. They're sitting next to it and somebody steals them. That then, if it was just sitting on the it would be in transit, but it's not in the vehicle. Correct. Then there would not be a coverage under 3A. And is that process, Tri-States process, a unique one, where they take it from the bank and bring it to a separate place and do all that sorting? I think the idea of ACMs and ATMs is a relatively new concept for purposes of the relatively arcane maturity bond industry. And perhaps over the last 20 years there's been a lot more of the ATM, ACM servicing contractor type of industry, which is what Tri-States Armored was supplying to Palm Desert and its customers in this case. Is it unusual? There are other cases where we've discussed the same sort of problem where funds were actually taken by the servicer from the servicer's location. And so based just upon those other cases I'm certain that this is a more and more typical system where the funds are being actually processed in a third party location. So how does Palm Desert protect itself? Well, that's an interesting question, but there are policies available that would cover exactly the situation that Palm Desert faced. And in fact what they did after our refusal to pay this claim is they bought a separate policy that covered them for activities that took place at these third party counting houses. From you? From Lloyds of London. Did you argue both the question of whether or not it was in the vehicle or not when it's actually in the headquarters of the company, transit company, was that argued to the district court? Yes, it was. And the only mention that is in the district court's ruling was a footnote toward the end of the decision where Judge Chiavelli found that the language of in an armored motor vehicle gives more credence to what he found otherwise. One final remark on the bad faith issue, and this is whether or not there's coverage under this policy there is definitely a genuine dispute. We understand. Thank you. Thank you. Your Honor, if I have any time left, I just want to make two brief points. Mr. Jensen was suggesting that what we should have done is had the cassettes loaded at First Union Bank in Philadelphia before they ever reached the armored vehicle. Well, First Union would not have provided that service to Tri-States. And secondly, that would not have covered the situation where when the full cassettes were placed in the ACM, the partially empty cassette was then taken out. It had to be reconciled and balanced, et cetera. So you wouldn't have been able to do it on both ends. The second point that Mr. Jensen ignores is that the language in the bond that Federal wrote said that the coverage began when the cash was picked up and ended when it was delivered to the intended addressee. This money was still in route to the intended addressee. But, Kelsey, you can't just segment out that language. You have to look at the whole section. I agree with Your Honor completely. That's why the seamless coverage that's provided under this bond is that while the cash is in the custody of Tri-States and while it's in route to its intended ACM. But it says in an armored motor vehicle, including loading and unloading, it's limited in that portion of it. So if you take your interpretation, being you just write out the limitation that's expressly stated here. What that is intended to mean, Your Honor, is that the coverage continues while it's in the custody of the armored carrier. The word custody isn't there was the point. The word custody doesn't need to be there because it's implicit in what the armored carrier has to do. They have custody of the cash. In BAC, custody is there, which evinces an intent to delete custody from any. Well, how can an armored carrier not have custody of the cash when it's in its carrier or it's being loaded or unloaded? And this cash went to the armored carrier's vault to be reconciled. And that's the part that they probably didn't want to cover. They wanted to cover it when it's in the armored vehicle, but not when it went to a third party. Then they should have specifically excluded that and they also should not have charged the premium that they did for this kind of coverage. Thank you. I'll submit. Thank you. Interesting case. The case just argued is submitted for decision. The next case on the calendar is NEXTG Networks of California v. The City of Huntington Beach.
judges: Schroeder, Rawlinson, Sandoval